IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KATHERINE MEJIA and JENNIFER SMITH,<br><br>Plaintiffs,<br><br>v.<br><br>IOWA BOARD OF EDUCATIONAL EXAMINERS and MICHAEL CAVIN, in his individual and official capacities as Executive Director of the Iowa Board of Educational Examiners,<br><br>Defendants. | NO. _____<br><br>PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

TABLE OF CONTENTS

Summary of the Argument………….…..…………………………………………………………1

Statement of the Facts......................................................................................................................2

Argument........................................................................................................................................6

    I. Legal Standard………….………………………………………………………...................6

    II. Plaintiffs Are Entitled to Immediate Injunctive Relief….…….…………………......………7

        A.  Irreparable Harm to Plaintiffs…………………………………………………………..7

        B.  Balance of Harms…………………………………….……….……..…………….....9

        C.  Likelihood of Success on the Merits……..………………………………………….11

        D.  Public Interest…………………………………………………………………………15

Conclusion…………………………………………………………………………………….17

## SUMMARY OF THE ARGUMENT

This action challenges the use of a state's professional licensing authority to retaliate against licensed educators for protected political speech. Plaintiffs Katherine Mejia and Jennifer Smith – two public school teachers – posted on social media as private citizens regarding political figures Charlie Kirk and President Donald Trump, both regular subjects of public commentary. The Iowa Board of Educational Examiners ("BOEE") and its Executive Director, Michael Cavin, solicited professional licensure complaints against public educators from public school district superintendents for the purpose of punishing and deterring disfavored viewpoints. This solicitation was carried out under the color of law and a veiled threat against the superintendents' own licensure for failure to comply. When Plaintiffs' employers received Cavin's solicitation, they immediately filed complaints against them.

Cavin and the BOEE have not acted as the Plaintiffs' employer to protect workplace efficiency or address disruption and are not entitled to the special deference established in *Pickering v. Board of Education*. Defendants have acted as a regulator, using the disciplinary machinery of the BOEE to obtain complaints and initiate licensure discipline against Plaintiffs and other educators like them. The First Amendment of the U.S. Constitution, made applicable to the States by the Fourteenth Amendment, does not permit Defendants to use professional licensing authority to punish dissent and deter politically disfavored speech. Defendants' conduct constitutes viewpoint discrimination and retaliation, triggering heightened constitutional scrutiny.

Plaintiffs seek immediate injunctive relief to halt ongoing unconstitutional retaliation by Defendants. Plaintiffs are currently under investigation by the BOEE and will face a probable cause finding as early as January 16, 2026 – the BOEE's next scheduled meeting. Any probable cause finding immediately becomes a public record attached to Plaintiffs' licensure file resulting

in reputational harm, embarrassment, and irreparable professional consequences. The BOEE's disciplinary process exposes Plaintiffs to a public hearing and an extensive public record even before a finding of fault, licensure sanctions including permanent revocation, reporting of any licensure sanction to a nationwide database, loss of employment and associated due process protections with the issuance of any licensure sanction, and permanent harm to their career in education. These injuries cannot be undone after the fact. The balance of harms and the public interest strongly favor preserving the status quo and protecting Plaintiffs constitutional rights while the Court considers the merits of their Complaint.

## STATEMENT OF THE FACTS

Plaintiffs Katherine Mejia and Jennifer Smith are licensed Iowa educators employed by public school districts and required, as a condition of their employment, to hold professional licenses issued by the BOEE. In September 2025, Mejia and Smith each separately commented on social media regarding nationally-prominent public figures and broader political and social issues. These posts were made on Plaintiffs' personal accounts outside of contracted work hours, using personal devices, and while acting solely as private citizens. Neither spoke pursuant to official job duties, nor referenced students or their employers. Plaintiffs' posts did not incite or condone violence.

Mejia is a licensed school counselor employed by the West Delaware Community School District ("WDCSD"). On September 10, 2025, while on approved leave from work to attend a medical appointment with her minor child, Mejia reposted a Facebook post concerning public figures Jeffrey Epstein and President Donald Trump, showing a photo of a large check with the comment, "At this point if you still support him you're a pediphile [sic] or ok with it happening…" She made a second post concerning public figure and political activist Charlie

Kirk, stating, "Let's make one thing clear from the start: Charlie Kirk was the victim of a shooting in a country where he, along with other right-wing extremist influencers, have been inciting violence for years. KIRK IS NEITHER A MARTYR NOR A HERO, HE IS A CAUSE!" Mejia's posts did not reference her employer, students, or advocate for political violence.

Jennifer Smith is employed as a Family and Consumer Sciences teacher by the Johnston Community School District ("JCSD"). On September 11, 2025, after the conclusion of her workday, Smith posted the following on Facebook:

> Words below are from the one that suddenly died due to gun violence. That one death flies our flags at half-staff and yet time and again, children and school staff are constantly dying just because they were doing their jobs for the betterment of society, are not honored nor barely remembered. There was a school shooting on this same day. Did you know that? Have you heard anything…See More.

An image followed Smith's comment, with this text overlayed:

> This is not eulogy-flattery. This is memory. We remember the things he said about Dr. Martin Luther King Jr. 'MLK was awful. He's not a good person.' We remember his calculation on gun violence: 'I think it's worth…some gun deaths every single year so that we can have the Second Amendment to protect our other God-given rights. That is a prudent deal. It is rational.' These are not the words of healing, not the words of unity. And yet they, too, are part of the ledger he leaves behind.

Smith further commented, "RIP you monster. I'm so sure your god is fine with the awful spread of hate you completed while here on earth." The post expressed Smith's personal views on Charlie Kirk, gun violence, and the relative public responses to Kirk's death and a school shooting that occurred on the same day. Smith's post included quotations from publicly available statements by Kirk, did not reference students or her employer, students, and did not incite or condone violence.

3

Plaintiffs' public employers experienced no disruption in public services or diminished efficiency. WDCSD received two complaints from the public about Mejia's posts. JCSD received one complaint regarding Smith's post. Neither were removed from their duties.

On September 16, 2025, WDCSD Superintendent Jen Vance issued Mejia a letter of reprimand, incorrectly asserting that the post had occurred during work hours and advising Mejia to exercise discretion in online activity. Vance did not identify any disruption to school operations, student activities, or the educational environment, and did not indicate that any further action would be taken.

On September 12, 2025, Smith was contacted by school administrators and advised that she could remove the post if she wished. Smith removed the post. JCSD administrators did not indicate that any employment action would be taken, and no disruption to student education, school operations, or school safety occurred.

In both school districts, the matter of Plaintiffs' posts appeared resolved at the local level until correspondence arrived from the BOEE. On September 19, 2025, Cavin, acting under color of state law as Executive Director of the BOEE, sent a letter on BOEE letterhead to all public school superintendents across the state, including WDCSD and JCSD. Cavin's letter stated that "comments regarding the assassination of Charlie Kirk made on social media have raised concerns regarding professionalism among Iowa educators," and that "condoning political or any type of violence is reprehensible and has no place in Iowa education." The letter suggested that educators who criticized Kirk in the wake of his death should face discipline for violation of the BOEE's *Standards of Professional Conduct and Ethics*, I.A.C. 282-Chapter 25, specifically Section 282-25.3(6)(d)(prohibiting a licensee from "[c]onducting professional business in such a way that the practitioner repeatedly exposes students or other practitioners to unnecessary

embarrassment or disparagement."). Cavin expressly "encouraged" superintendents to file complaints, confirming that "[a]ll submitted complaints will receive a comprehensive investigation." This apparent assurance was provided despite preliminary jurisdictional requirements imposed by Iowa Code section 256.146(14)(a)(requiring "specificity in written complaints that are filed by individuals who have personal knowledge of an alleged violation and which are accepted by the board" and that "jurisdictional requirements as set by the board in administrative rule are met on the face of the complaint before initiating an investigation of allegations") and I.A.C. 282-11.3.[1]

Prior to Cavin's September 19 letter, the BOEE regularly communicated with superintendents in a similar format regarding *mandatory* reporting requirements under Iowa Code section 256.146. *See e.g.*, Cavin Memo to Education Stakeholders - Required Reporting, July 22, 2024, available at https://educate.iowa.gov/media/8378/download?inline. However, a violation of Section 282-25.3(6)(d) does not necessitate a *mandatory* report under Iowa law. Nevertheless, Cavin's letter, in the context of a history of similar communications to school administrators warning of *mandatory* reporting requirements, combined with the language used, created a veiled threat of licensure repercussions for any administrator who failed to report a known expression disfavoring Charlie Kirk, his work or ideology, in the wake of his death.

---

[1] I.A.C282—11.3(17A,256) Jurisdictional requirements. 11.3(1) The case must relate to alleged violation of the criteria of professional practices or the criteria of competent performance. 11.3(2) The magnitude of the alleged violation must be adequate to warrant a hearing by the board. 11.3(3) There must be sufficient evidence to support the complaint. 11.3(4) The complaint must be filed by a person who has personal knowledge of an alleged violation and must include a concise statement of facts that clearly and specifically apprises the respondent of the details of the allegation(s). 11.3(5) The complaint must be filed within three years of the occurrence of the conduct upon which it is based or discovery of the conduct by the complainant unless good cause can be shown for extension of this limitation or unless the conduct constitutes conduct described in Iowa Code section 256.160(1)"a"(1) (a). 11.3(6) The jurisdictional requirements must be met on the face of the complaint before the board may order an investigation of the allegation(s) of the complaint.

After receiving Cavin's letter, Plaintiffs' employers filed professional licensure complaints against them with the BOEE. In Mejia's case, Vance expressly stated in her complaint that the filing was prompted by Cavin's letter. In Smith's case, Superintendent Dr. Nikki Roorda called Smith to her office and told her the BOEE had put out a directive to report posts concerning Charlie Kirk. Roorda's complaint followed Cavin's direction to cite Section 282-25.3(6)(d). But for Cavin's letter, Plaintiffs would not be facing professional licensure complaints.

## ARGUMENT

### I. Legal Standard

When deciding whether to award preliminary injunctive relief, the Court considers four factors: (1) the threat of irreparable harm to the movant; (2) the relative balance between the irreparable harm to the movant and the harm to the nonmoving party if the injunction is awarded; (3) the movant's likelihood of success on the merits – the factor deemed most significant; and (4) the public interest. *See Datapahse Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *see also Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025). When a plaintiff has shown the third element – a likelihood of success – the other requirements "are generally deemed to have been satisfied." *Id*.

"An injunction is a matter of equitable discretion." *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008). "Balancing the equities is an important part of the analysis because it avoids unnecessary real-world injury to people with colorable legal claims." *Trump v. Orr*, 223 L.Ed.2d 180, 181 (2025). The "touchstone" of equitable relief, like the relief sought here – a preliminary injunction – is "fairness." *Id.* at 183.

## II. Plaintiffs are Entitled to Immediate Injunctive Relief.
### A. Irreparable Harm to Plaintiffs

In the absence of immediate injunctive relief, Plaintiffs will suffer irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020); *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *GMC v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Where a plaintiff demonstrates a likelihood of success on a First Amendment claim, irreparable harm is presumed. *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). That presumption is particularly strong where, as here, the State has initiated or threatened professional discipline in response to protected speech. *See Levin v. Harleston*, 966 F.2d 85, 89-90 (2d Cir. 1992). Courts addressing similar circumstances have recognized that threatened professional discipline for protected speech constitutes irreparable harm, warranting immediate injunctive relief. *See, e.g., Hook v. Rave*, No. 4:25-CV-04188-KES, 2025 U.S. Dist. LEXIS 190287, at *13–14 (D.S.D. Sept. 24, 2025).

Courts routinely recognize that the chilling effect of threatened sanctions is by itself irreparable because it deters not only the plaintiff, but similarly situated professionals, from exercising constitutional rights. *See Am. Ass'n of Univ. Professors v. Trump, No. 25-cv-07864-RFL*, 2025 U.S. Dist. LEXIS 224922, at *38-43 (N.D. Cal. Nov. 14, 2025); *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000); *Vollmecke v. Indep. Sch. Dist.*, No. 23-00644-CV-W-BP, 2023 U.S. Dist. LEXIS 237540, at *11-12 (W.D. Mo. Dec. 11, 2023). This chilling effect warrants equitable relief, even if "extraordinary." *See Hook v. Rave,* No. 4:25-CV-04188-KES, 2025 U.S. Dist.

LEXIS 190287, at *13 (D.S.D. Sep. 24, 2025)(granting preliminary injunction to public university professor enjoining university's attempt to terminate him for post addressing Charlie Kirk).

In addition to the constitutional injury, Plaintiffs face concrete, non-speculative professional harms that cannot be remedied after the fact. The BOEE investigatory and disciplinary process exposes Plaintiffs to a public finding of probable cause that they have engaged in unethical misconduct, mandatory public notices and hearings, suspension or revocation of licensure, and reporting of those sanctions to a national educator database. Once such information is made public or reported, Plaintiffs' professional reputation, employment prospects, and standing in the educational community will be permanently damaged in ways that no later judicial ruling can undo. *See generally Am. Ass'n of Univ. Professors v. Trump*, No. 25-cv-07864-RFL, 2025 U.S. Dist. LEXIS 224922, at *46 (N.D. Cal. Nov. 14, 2025)(finding unlawful coercion of speech where threats of dire consequences to the speaker by government combined with authority and express intent to carry them out).

The irreparable nature of these harms is compounded by the statutory and regulatory consequences of licensure discipline under Iowa law. A finding of probable cause or imposition of discipline by the BOEE constitutes independent grounds for termination of employment by local school districts under Iowa Code section 279.27 and may preclude future employment in the profession. Monetary damages cannot restore a professional license, erase public disciplinary records, or eliminate the stigma associated with state-imposed sanctions. Further, and more worrisome, is Defendant Cavin's apparent position that he yields the authority under Iowa Code chapter 256 to unilaterally, without notice or due process, revoke the license of a licensee. Pl. Comp. ¶¶ 53-54; Ex. K. Cavin's interpretation of his authority as Executive Director the BOEE,

while seemingly unlawful, subjects Plaintiffs to even greater risk of immediate and irreparable harm. These are particularly "unique circumstance[s]" imposed upon Plaintiffs as public educator and BOEE licensees cause irreparable harm in the absence of a preliminary injunction. *See Gray*, No. 4:25-cv-01057-LPR, 2025 U.S. Dist. LEXIS 229156, at *6 (noting unique circumstances may "create an atypical irreparable harm").

Finally, the harm to Plaintiffs is imminent. Plaintiffs are currently subject to ongoing BOEE investigations, and the disciplinary process will continue absent court intervention. The BOEE meets next on January 16, 2026. Once the BOEE advances to probable cause determinations and public proceedings, the injury will be complete. Injunctive relief at this stage is therefore necessary to preserve Plaintiffs' constitutional rights and prevent irreversible professional damage.

### B. Balance of Harms

The balance of harms weighs decisively in Plaintiffs' favor. Absent injunctive relief, Plaintiffs face immediate and irreversible injury to their constitutional rights, professional licenses, and livelihoods. By contrast, Defendants will suffer no cognizable harm from a temporary injunction by preserving the status quo while this Court resolves the constitutional issues presented.

As set forth above, Plaintiffs are currently subject to BOEE disciplinary proceedings initiated in response to their protected speech. Those proceedings expose Plaintiffs to public findings of probable cause, mandatory public notice, national database reporting, suspension or revocation of licensure, and automatic grounds for termination of employment under Iowa law. Once these consequences occur, the resulting damage to Plaintiffs' reputations, careers, and First Amendment freedoms cannot be undone. These harms are concrete, imminent, and permanent.

Defendants, by contrast, face only a temporary pause in discretionary licensure enforcement based solely on Plaintiffs' private political speech. The requested injunction does not prevent the BOEE from carrying out its core regulatory functions, protecting students, or enforcing neutral ethical standards against actual professional misconduct. It merely restrains Defendants from continuing disciplinary action predicated on speech that is constitutionally protected.

Courts consistently recognize that when the government's asserted harm consists of delayed enforcement, while the plaintiff faces loss of constitutional rights and professional standing, the balance of harms favors injunctive relief. *See Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). Preserving the status quo during litigation imposes minimal burden on the State, particularly where no showing has been made that immediate enforcement is necessary to protect the public.

Moreover, any administrative inconvenience to Defendants is self-inflicted. The BOEE initiated these proceedings not in response to demonstrated harm or professional unfitness, but as the result of a statewide solicitation of complaints based on the content and viewpoint of educators' speech. Defendants cannot now claim hardship from being temporarily restrained from pursuing enforcement actions that raise serious constitutional concerns.

In short, Plaintiffs face profound and irreversible harm if relief is denied, while Defendants face, at most, a brief delay in discretionary enforcement if relief is granted. Under *Dataphase*, this imbalance strongly favors issuance of a temporary restraining order and preliminary injunction.

### C. Likelihood of Success on the Merits

To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, Plaintiffs must show (1) they engaged in constitutionally protected speech, (2) Defendants' actions caused them to suffer harm that would "chill a person of ordinary firmness from continuing . . . in that activity," and (3) Defendants' actions were motivated, at least in part, by Plaintiffs' exercise of their constitutional rights. *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir. 2001)(citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)).

#### 1. Plaintiffs Engaged in Protected Speech

When they posted on social media, Plaintiffs were engaged in political expression on matters of public concern in their capacity as private citizens. An employee's speech is constitutionally protected speech when she is speaking as a private citizen on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 411 (2006). Plaintiffs' social media posts were made outside of work hours, on personal devices, and addressed nationally prominent public figures and political issues. Such speech "lies at the heart of the First Amendment." *Lane v. Franks*, 573 U.S. 228, 235–241 (2014)(stating matters of public concern include matters "of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."); *see also Connick v. Myers*, 461 U.S. 138, 146-48 (1983)(finding a matter of public concern is one that "relat[es] to any matter of political, social, or other concern to the community.")

Plaintiffs did not speak pursuant to official job duties, did not reference students, and did not purport to act on behalf of their employers or the State. *See Garcetti*, 547 U.S. 410 at 411 (stating employee's speech "ow[ing] its existence" to the employee's professional responsibilities is not speech as a private citizen). Even if Plaintiffs' posts are found objectionable, their First

11

Amendment rights are not overcome. *See Rankin v. McPherson*, 483 U.S. 378, 381 (1987)(finding unconstitutional the termination of a government employee for her statement in the workplace, upon hearing of the attempted assassination of Ronald Reagan, that she disagreed with the President's policies and, "If they go for him again, I hope they get him.").

### 2. Defendants Took Adverse State Action

Defendants' solicitation, investigation, and threat of prosecution of professional licensure complaints constitutes adverse state action against Plaintiffs. While the licensure complaints were filed against Plaintiffs by their employers, "[a] government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a [third] party to punish or suppress disfavored speech on her behalf." *Am. Ass'n of Univ. Professors v. Trump*, No. 25-cv-07864-RFL, 2025 U.S. Dist. LEXIS 224922, at *46 (N.D. Cal. Nov. 14, 2025). The Eighth Circuit recognizes that government conduct which would "chill a person of ordinary firmness from continuing to engage in protected activity" satisfies the adverse-action element. *Grooms v. Privette*, 127 F.4th 730, 734 (8th Cir. 2025). Whether adverse state action would chill a person of ordinary firmness is an objective inquiry – it is not merely whether Plaintiffs themselves may be chilled. *McNeally v. HomeTown Bank*, 155 F.4th 1000, 1007-08 (8th Cir. 2025)(finding a ban from public property is a "concrete consequence[ ]" imposed by government sufficient to cause chilling effect). Plaintiffs' professional licensure is subject to permanent revocation by Defendants, a much more severe consequence than many found to be sufficient to chill protected speech. *See Henderson v. Springfield R-12 Sch. Dist.*, Nos. 23-1374, 23-1880, 2025 U.S. App. LEXIS 33883, at *26-27 (8th Cir. Dec. 30, 2025)(finding a the threat of being asked to leave a anti-racism training, losing pay for the day, and possible termination for failing to agree with school district's views sufficient to show objectively reasonable chilling effect); *Garcia v. City of*

12

*Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)(finding parking tickets issued in retaliation for heated exchange with mayor was sufficient to show chilling).

Here, Plaintiffs face ongoing BOEE investigations that expose them to public probable-cause determinations, mandatory public notice, national databank reporting of any sanction, reprimand, suspension or revocation of their licensure, and negative employment consequences. These severe consequences plainly qualify as adverse action and would deter any reasonable educator from engaging in protected speech. Frankly, they would lead any rational teacher to self-sensor from *any* personal political speech.

### 3. Causation and Retaliatory Motive Are Established

The causal connection between Plaintiffs' speech and the adverse action is direct and well-documented. Defendant Cavin issued a statewide letter expressly encouraging school administrators to file licensure complaints based on social media speech concerning Charlie Kirk. Plaintiffs' superintendents cited that directive as the reason for filing the complaints. Absent Cavin's solicitation, no BOEE complaints would have been filed.

This evidence establishes both causation and retaliatory motive. Defendants did not respond to disruption or professional misconduct; they affirmatively created enforcement pressure based on the content and viewpoint of Plaintiffs' speech. Such conduct satisfies the causation requirement under §1983 and the First Amendment.

### 4. Pickering Does Not Shield Defendants' Conduct

This is not a case necessitating the application of Pickering balancing. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it

13

performs through its employees."). The BOEE is not Plaintiffs' employer and did not act to protect workplace efficiency or operational integrity. It acted as a licensing authority, using regulatory power to discipline private speech. Where the State acts as regulator rather than an employer, *Pickering* deference does not apply.

Even if *Pickering* were deemed to apply, Defendants have failed to identify disruption to school operations, student safety, or professional performance. A public entity must demonstrate actual or reasonably predicted disruption with specificity. *Melton v. City of Forrest City*, 147 F.4th 896, 902-903 (8th Cir. 2025)(finding insufficient disruption where based on allegation that "several" police officers and city-council members were upset and "phone lines [were] jammed" with calls from "concerned citizens").

### 5. Defendants' Conduct Constitutes Viewpoint Discrimination

Most significantly, Plaintiffs are likely to succeed because Defendants' actions constitute viewpoint discrimination. Cavin's directive targeted educators who expressed views critical of Charlie Kirk and encouraged discipline for those viewpoints. Viewpoint discrimination is "an egregious form of content discrimination" and is presumptively unconstitutional. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The State may not condition professional licensure on ideological conformity or punish disfavored political views expressed outside the scope of professional duties. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 771 (2018)(stating even regulation of a professional speech creates "inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information"); *Baird v. State Bar of Arizona*, 401 U.S. 1, 8 (1971). Plaintiffs' evidence demonstrates that the BOEE disciplinary process was invoked precisely because of the viewpoints Plaintiffs expressed, not because of any legitimate regulatory concern. *See Nat'l Inst.*

*of Family & Life Advocates v. Becerra*, 585 U.S. at 772 (stating "the people lose when the government is he on deciding which ideas should prevail.").

### 6. Plaintiffs Are Likely to Succeed

Plaintiffs are likely to succeed on the merits of their First Amendment claims. Their speech was made as private citizens on matters of public concern. Defendants' actions constitute viewpoint discrimination and retaliation, unsupported by any showing of disruption, unfitness, or legitimate regulatory interest. The First Amendment does not permit the State to weaponize professional licensure to suppress political dissent.

### D. Public Interest

The public interest strongly favors issuance of an award of injunctive relief to Plaintiffs. It is well settled that "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008); *accord G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Where state action threatens to chill protected speech, the public interest is served—not harmed—by judicial intervention that preserves First Amendment freedoms pending adjudication on the merits. *See Hook v. Rave*, No. 4:25-CV-04188-KES, 2025 U.S. Dist. LEXIS 190287, at *14 (D.S.D. Sep. 24, 2025)(finding temporary restraining order in the public interest where university professor was threatened with termination based on social media criticism of Charlie Kirk). This principle carries particular force where the State acts through a professional licensing authority. The public has a compelling interest in ensuring that licensing boards exercise their substantial regulatory power in a viewpoint-neutral manner and do not use licensure enforcement to suppress political dissent or enforce ideological conformity. When a licensing agency disciplines or threatens discipline based on the content or viewpoint of private speech, the resulting chilling effect extends beyond the

15

individual plaintiffs to all similarly situated professionals. Injunctive relief serves the public interest by preventing that systemic chill.

The public interest also favors maintaining the integrity and legitimacy of professional licensing systems. Licensing boards are entrusted with protecting the public from incompetence, misconduct, or unfitness—not with policing political views expressed outside the scope of professional duties. Allowing licensure processes to be used as tools of political retaliation undermines public confidence in regulatory institutions and diverts them from their proper purpose. Temporarily enjoining such action preserves the credibility of the licensing system while constitutional claims are resolved.

Nor does the requested relief deserve any countervailing public interest. Plaintiffs do not seek to prevent the BOEE from regulating actual professional misconduct, protecting students, or enforcing neutral ethical standards. They seek only to halt disciplinary proceedings initiated in response to protected speech. A narrowly tailored injunction preserving the status quo does not endanger public safety, educational integrity, or regulatory enforcement.

Finally, the public interest is served by ensuring that constitutional disputes are resolved deliberately rather than through irreversible administrative action. Once public licensure discipline occurs, the resulting harm to speech, reputation, and professional standing cannot be undone. Granting interim relief allows the Court to adjudicate Plaintiffs' claims without the pressure of irreversible consequences and ensures that constitutional boundaries are respected during that process.

For these reasons, the public interest weighs heavily in favor of granting the requested temporary restraining order and preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a temporary restraining order and preliminary injunction enjoining Defendants from continuing the BOEE investigation and disciplinary process in retaliation against the Plaintiffs because of their protected speech, and preserving the status quo pending final adjudication.

Dated: January 9, 2026

                Respectfully submitted,

                /s/ Christy A.A. Hickman
                Christy A.A. Hickman AT0000518
                Becky S. Knutson AT0004225
                Katherine E. Schoolen  AT0010031
                IOWA STATE EDUCATION ASSOCIATION
                777 3rd St.
                Des Moines, Iowa 50309
                Telephone: (515) 471-8004
                Facsimile: (515) 471-8017
                E-mail: christy.hickman@isea.org
                       becky.knutson@isea.org
                       katie.schoolen@isea.org
                ATTORNEYS FOR PLAINTIFFS